UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JACOB ADONI, on behalf of himself and all other similarly situated,

          Plaintiff,

against

CITICORP CREDIT SERVICES, INC. (USA),

          Defendant.

Case No. 21-cv-2108(JMA)(AYS)

---

### PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff hereby provides this notice of supplemental authority of one new opinion, *Davitashvili v. Grubhub Inc.*, 2023 U.S. Dist. LEXIS 44780, 2023 WL 2537777 (S.D.N.Y. Mar. 16, 2023) a copy of which is attached hereto as Exhibit A.

Plaintiff respectfully submits that this decision further supports his position in this matter in support of Plaintiff's Opposition to Defendants Renewed Motion to Compel Arbitration and Stay Proceedings (Doc. No. 32).

Dated: February 26, 2024
   Carle Place, NY

Respectfully Submitted,

 /s/Michael A. Tompkins
Michael A. Tompkins, Esq.
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 873-9550
mtompkins@leedsbrownlaw.com

*Attorneys for Plaintiff and Putative Class*

1

# EXHIBIT A

# Davitashvili v. Grubhub Inc.

United States District Court for the Southern District of New York

March 16, 2023, Decided; March 16, 2023, Filed

20-cv-3000 (LAK)

**Reporter**
2023 U.S. Dist. LEXIS 44780 *; 2023 WL 2537777

MARIAM DAVITASHVILI, et al., Plaintiffs, v. GRUBHUB INC., et al., Defendants.

**Subsequent History:** Appeal filed, 04/10/2023

**Prior History:** *Davitashvili v. Grubhub Inc., 2022 U.S. Dist. LEXIS 58974, 2022 WL 958051 (S.D.N.Y., Mar. 30, 2022)*

## Core Terms

terms, arbitration, Platform, arbitration clause, defendants', arbitration agreement, users, updated, class action, assent, unconscionable, parties, restaurants, delegation, initial burden, Plaintiffs', notice, agreement to arbitrate, disputes, pop-up, screen, email, manifested, demonstrating, subsidiaries, threshold, infinite, courts, orders, meals

**Counsel:** [*1] For Plaintiffs: Gregory A. Frank, Marvin L. Frank, Asher Hawkins, FRANK LLP; Kyle W. Roche, Edward Normand, Stephen Lagos, ROCHE CYRULNIK FREEDMAN LLP.

For Defendant Grubhub Inc.: David J. Lender, Eric S. Hochstadt, Luna Ngan Barrington, WEIL, GOTSHAL & MANGES LLP.

For Defendant Postmates Inc.: Derek Ludwin, Stacey K. Grigsby, Andrew A. Ruffino, COVINGTON & BURLING LLP; Steven C. Sunshine, Karen M. Lent, Evan Kreiner, SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP.

For Defendant Uber Technologies, Inc.: Derek Ludwin, Stacey K. Grigsby, Andrew A. Ruffin, COVINGTON & BURLING LLP,.

**Judges:** Lewis A. Kaplan, United States District Judge.

**Opinion by:** Lewis A. Kaplan

## Opinion

**MEMORANDUM OPINION**

LEWIS A. KAPLAN, *District Judge*.

This matter is before the Court on the motions of Grubhub, Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber" or "Uber Eats"), and Postmates Inc. ("Postmates") to compel plaintiffs Mariam Davitashvili, Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, and Nathan Obey (the "Platform Plaintiffs") to arbitrate their claims, based on arbitration provisions in defendants' respective terms of use. (Dkt 72; Dkt 76) For the reasons set forth below, defendants' motions are denied.

*Facts*

This matter arises from [*2] a putative class action involving the contractual relationships between restaurants and online ordering platforms for restaurant meals. The amended complaint alleges that the defendants each unlawfully has fixed prices for restaurant meals by entering into restrictive agreements with restaurants that preclude those restaurants from charging lower prices off-platform. The no-price-competition clauses ("NPCCs") contained in these agreements prohibit restaurants that sell through Grubhub or Uber from selling meals at lower prices either directly to consumers or through a competing platform, like Doordash.[1] Postmates requires a narrower version of an NPCC, which prohibits restaurants from selling meals at lower prices directly to consumers, but not through other channels.[2] Plaintiffs claim that defendants thus have caused them to pay artificially high prices for restaurant meals.[3] They seek damages and injunctive relief under Section 1 of the Sherman Act and its state analogues on behalf of themselves and three putative nationwide classes. Plaintiffs seek damages for (i) their direct purchases from restaurants bound by defendants' NPCCs and (ii) their purchases from such restaurants through non-defendant platforms.[4]

On March 30, 2022, the Court denied defendants' joint motion to dismiss these claims. (Dkt 46) Approximately two months later, defendants served interrogatories on plaintiffs, requesting that they "identify the Meal Order Platforms through which" they ordered "at any point during the Class Period."[5] In response, the Platform Plaintiffs disclosed that they each had used at least one of the defendants' platforms, whereas plaintiff Malik Drewey disclosed that he never had used those platforms.[6] Defendants move to compel arbitration against the Platform Plaintiffs on the basis of their use of the defendants' platforms and the arbitration clauses contained within the defendants' respective "Terms of Use."

*The Arbitration Clauses in Defendants' Terms of Use*

*A. Grubhub's Terms of Use*

Grubhub merged with Seamless North America LLC ("Seamless"), another meal-delivery platform, in August 2013.[7] It is undisputed that each Platform Plaintiff opened an account with either Grubhub or its predecessor in interest, Seamless, prior to the filing of this action in April 2020. Grubhub asserts that its terms of use were published on its website "[b]efore this case was filed and during the pendency [*4] of the litigation."[8] However, Grubhub submitted no evidence demonstrating how those terms appeared or could be accessed.[9]

Grubhub claims that it requires customers to agree to its terms of use each time a customer places a pick-up or delivery order.[10] It is undisputed that the Platform Plaintiffs each have placed orders on Grubhub during the pendency of this action and since Grubhub updated its terms of use on December 14, 2021.

---

[1] Dkt 28, ¶¶ 55-56, 59-61. All docket citations are to No. 20-cv-3000 (LAK).

[2] [*3] *Id.* ¶¶ 57-58.

[3] *Id.* ¶¶ 1, 188-216.

[4] *Id.* ¶¶ 173-75.

[5] Hochstadt Decl. Ex. B, at 4-5.

[6] *Id.*

[7] Koreis Decl. ¶ 4.

[8] *Id.* ¶ 8.

[9] *See* Dkt 87, at 13.

[10] *See* Koreis Decl. ¶ 10.

Grubhub argues that the Platform Plaintiffs are bound by the updated terms, which govern consumers "use" of Grubhub's platform.

First, the Terms of Use provide:

> "Grubhub Holdings Inc. and its subsidiaries and affiliates ('Grubhub,' 'we,' 'our,' or 'us') own and operate certain websites, including related subdomains; our mobile, tablet and other smart device applications; application program interfaces; in-store kiosks or other online services; other tools, technology and programs (collectively, the 'Platform') and all associated services (collectively, the 'Services'); in each case, that reference and incorporate this Agreement. . . . *This Agreement constitutes a contract between you and us that governs your access and use of the Platform and Services.*"[11]

They [*5] also contain a provision entitled "Mutual Arbitration Provision," which states that Grubhub users are required to submit "any" dispute with Grubhub to arbitration:

> "You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, *or any other dispute with Grubhub*, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a 'Dispute') *shall be submitted exclusively to binding arbitration.* Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the termination of this Agreement. This Mutual Arbitration Agreement is intended to be broadly interpreted."[12] The Grubhub arbitration clause states also that "issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide."[13]

Part III of [*6] the "Dispute Resolution" section is entitled "Class Action and Collective Relief Waiver" and provides in relevant part:

> "You acknowledge and agree that, to the maximum extent allowed by law, except as set out in Section VII below, *there shall be no right or authority for any dispute to be arbitrated or litigated on a class, joint, collective or consolidated basis* or in a purported representative capacity on behalf of the general public, or as a private attorney general or for public injunctive relief."[14]

B. *Uber's Terms of Use*

The Platform Plaintiffs each created Uber accounts between 2014 and 2018.[15] Uber claims that, in the process of creating their accounts, the Platform Plaintiffs each agreed to Uber's terms of use in effect at that time.

Uber updated its terms of use on December 16, 2021.[16] Uber claims that it notified users of that update via "an in-app blocking pop-up screen that appeared when the user opened an Uber App."[17] Uber asserts that, "[t]o proceed

---

[11] Koreis Decl. Ex. D, at 2 (emphasis added).

[12] *Id.* at 21 (emphasis added).

[13] *Id.*

[14] *Id.* at 22 [emphasis added].

[15] Sullivan Decl. ¶ 25.

[16] *Id.* ¶ 35.

[17] *Id.* ¶ 39.

past the pop-up screen, the user was required to affirmatively check a box labeled 'By checking the box, I have reviewed and agreed to the Terms of Use and acknowledged the Privacy Notice' and click ' Confirm.'"[18] Each of the Platform [*7] Plaintiffs except for Adam Bensimon, provided "check-box consent" via this pop-up screen, and thus are bound by Uber's December 2021 terms of use.[19] As to plaintiff Bensimon, Uber asserts that he has used his "Uber account as recently as November 18, 2021," and that he therefore is bound by Uber's June 2021 terms of use.[20]

For purposes of Uber's motion, Uber and the Platform Plaintiffs treat the July 2021 and December 2021 terms of use as substantially identical.[21] In both versions, the terms of Use govern consumers' "access or use" of Uber's platform as follows:

> "Uber provides a personalized multipurpose digital marketplace platform Miler Marketplace Platform') that enables you to conveniently find, request, or receive transportation, logistics and/or delivery services from third-party providers that meet your needs and interests. *These Terms of Use ('Terms') govern your access or use*, from within the United States and its territories and possessions, of the Uber Marketplace Platform and any related content or services (collectively, the 'Services,' as more fully defined below in Section 3) made available in the United States and its territories and possessions *by Uber Technologies,* [*8] *Inc. and its subsidiaries*, representatives, affiliates, officers and directors (collectively, 'Uber')."[22] Section 2(a)(1) of Uber's terms of use contains an arbitration provision titled
"Covered Disputes," which provides:

> "Except as expressly provided below in Section 2(b), you and Uber agree that any dispute, claim, or controversy in any way arising out of or relating to (i) these Terms and prior versions of these Terms, or the existence, breach, termination, enforcement, interpretation, scope, waiver, or validity thereof; (ii) your access to or use of the Services at any time; (iii) incidents or accidents resulting in personal injury to you or anyone else that you allege occurred in connection with your use of the Services (including, but not limited to, your use of the Uber Marketplace Platform or the driver version of the Uber App), regardless whether the dispute, claim, or controversy occurred or accrued before or after the date you agreed to the Terms and regardless whether you allege that the personal injury was experienced by you or anyone else; and (iv) *your relationship with Uber, will be settled by binding individual arbitration between you and Uber, and not in a court of law.* This Arbitration [*9] Agreement survives after your relationship with Uber ends."[23]

Section 2(a)(2), titled "Class Action Waiver," expands the scope of Uber's arbitration rights from those expressed in Section 2(a)(1). It provides in pertinent part: "You acknowledge and agree that *any and all disputes, claims, or controversies* between the parties shall be resolved only in individual arbitration."[24] That section provides also:

> *"The parties expressly waive the right to have any dispute, claim, or controversy brought, heard, administered, resolved, or arbitrated as a class, collective, coordinated, consolidated, and/or representative action*, and

---

[18] *Id.*

[19] *Id.* ¶ 40.

With the exception of plaintiff Bensimon, the Platform Plaintiffs do not dispute that they assented to Uber's December 2021 terms of use. *See* Dkt 87, at 28-29.

[20] Sullivan Decl. ¶ 41.

[21] *See* Dkt 87, at 16.

[22] Sullivan Decl. Ex. F, at 55 (emphasis added).

[23] *Id.* at 56-57 (emphasis added).

[24] *Id.* at 57 (emphasis added).

neither an arbitrator nor an arbitration provider shall have any authority to hear, arbitrate, or administer any class, collective, coordinated, consolidated, and/or representative action, or to award relief to anyone but the individual in arbitration. The parties also expressly waive the right to seek, recover, or obtain any non-individual relief. . . . The parties further agree that if for any reason a claim does not proceed in arbitration, this Class Action Waiver shall remain in effect, and *a court may not preside over any action joining, coordinating, or consolidating the claims of multiple [\*10] individuals against Uber in a single proceeding*, except that this Class Action Waiver shall not prevent you or Uber from participating in a classwide, collective, and/or representative settlement of claims."[25]

Section 2(a)(4) of Uber's terms of use is entitled "Delegation Clause" and provides: "Only an arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. *An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues*, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel. However, *only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver* and Mass Action Waiver, including but not limited to, any claim that all or part of the Class Action [\*11] Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable . . . ."[26]

C. Postmates' Terms of Use

Between 2015 and 2018, plaintiffs Boisi, Davitashvili, Obey, and Swaby created user accounts with Postmates.[27] Postmates was acquired by and became a wholly owned subsidiary of Uber on December 1, 2020.[28]

Uber asserts that Postmates emailed users between March 17, 2021 and mid-April 2021 informing them that "the Postmates App had been updated, and that their accounts would be linked with Uber."[29] This email included a blue hyperlink to Uber's terms of use and informed Postmates users that they would be subject to an updated arbitration agreement.[30] Plaintiffs Boisi, Davitashvili, Obey, and Swaby thereafter accepted Uber's December 2021 terms of use, which defined Uber to include "its subsidiaries," including Postmates.[31] Thus, Uber argues that those plaintiffs agreed to arbitrate "any disputes they may have" with Postmates on an individual, non-class basis through binding arbitration.[32]

---

[25] *Id.* (emphasis added).

[26] *Id.* (emphasis added).

[27] *See* Dkt 87, at 15 (citing Sullivan Decl. ¶¶ 7, 9).

[28] *See* Dkt 90, at 7 (citing Sullivan Decl. ¶ 9; id. Exs. A and B).

Uber claims that these plaintiffs were required to accept Postmates' then-operative terms of use, which included an arbitration clause, in order to create a Postmates account. *See* Dkt 77, at 1 n.1. Use of the term "Postmates" for events prior to December 1, 2020 herein refers to the independent corporation formerly known as Postmates Inc.

[29] Sullivan Decl. ¶ 21.

[30] *See id.* ¶¶ VII 17-23.

[31] *See* Dkt 90, at 7 Sullivan Decl. Ex. D, at 3-4, 6-7).

[32] *See* Dkt 77, at 5.

Prior to its acquisition by Uber, Postmates had a terms of service agreement that included an arbitration clause, class action waiver, and delegation clause. **[*12]** [33] Postmates' December 2019 terms of service provided that issues "relating to [] scope, enforceability, and arbitrability" were delegated to the arbitrator.[34]

## Discussion

### Legal Standard

Section 2 of the FAA provides, in relevant part, as follows:
> "A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[35]

Under Section 4 of the Act, a party to "a written agreement for arbitration" my petition a district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."[36] To decide whether the parties agreed to arbitrate, a court must apply "ordinary state-law principles that govern the formation of contracts."[37] Significantly, the FAA Was intended to make arbitration agreements "as enforceable as other contracts, but not more so."[38] Thus, "the FAA does not require parties to arbitrate when they have not agreed to do so."[39] Nor does it require arbitration when, under generally applicable principles of state law, the agreement **[*13]** would be unenforceable.[40]

"In deciding a motion to compel, courts apply a 'standard similar to that applicable for a motion for summary judgment" and "draw all reasonable inferences in favor of the non-moving party."[41] The movant "bears an initial

---

[33] *See* Sullivan Decl. ¶¶ 15-16; *id.* Ex. B, at 63, 86-91.

[34] *Id.* Ex. B, at 87-88.

[35] 9 U.S.C. § 2.

The Supreme Court has held that express class action waivers also are valid and enforceable. *See DirecTV, Inc. v. Imburgia, 577 U.S. 47, 55, 58-59, 136 S. Ct. 463, 193 L. Ed. 2d 365 (2015)* (enforcing express class action waiver upon holding that the FAA preempted California state law rendering class-arbitration waivers unenforceable); *Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233, 133 S. Ct. 2304, 186 L. Ed. 2d 417 (2013)* (enforcing express class action waiver after finding that "[n]o contrary congressional command" overrode the overarching principle that "arbitration is a matter of contract").

[36] 9 U.S.C. § 4.

[37] *First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*.

[38] *Volt Info. Scis. Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478, 109 S. Ct. 1248, 103 L. Ed. 2d 488 (1989)* (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 n.12, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)*).

[39] *Id.* (citing *Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985)*).

[40] *See, e.g., Perry v. Thomas, 482 U.S. 483, 492 n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)*; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)*; *see also Doctor's Assocs. Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)*.

[41] *Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016)* (quoting *Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003)*).

burden of demonstrating that an agreement to arbitrate Was made."[42] If the moving party fails to make an adequate showing, the motion to compel arbitration must be denied.[43] If, on the other hand, the moving party satisfies this burden "by a showing of evidentiary facts,[44] the burden shifts to the party "seeking to avoid arbitration" to "show the agreement to be inapplicable or invalid."[45]

Once a court finds that the movant has satisfied its initial burden, "the question of whether the particular dispute [at issue] is subject to an arbitration agreement 'is typically an issue for judicial determination.'[46] If, however, the agreement contains a provision that "clearly and unmistakably" delegates the threshold issue of arbitrability to the arbitrator,[47] such a delegation must be enforced "even if the court thinks that the [movant's] arbitrability claim is wholly groundless."[48] That is, unless a non-moving party challenges the validity [*14] of the delegation clause itself, in which case "the federal court must consider the challenge before ordering compliance with that [delegation clause] under § 4 [of the FAA]."[49]

If a court reaches the arbitrability issue, the Second Circuit instructs courts to "undertake a three-part inquiry" when evaluating a motion to compel arbitration.[50] "First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow."[51] The Circuit has described a "clause submitting to arbitration 'any claim or controversy arising out of or relating to the agreement' as the "paradigm of a broad [arbitration] clause."[52] "Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause."[53] In general, "[w]here the arbitration clause is narrow, a collateral matter will . . . be ruled beyond its purview."[54] By contrast, "[w]here the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will

---

[42] Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010).

[43] See Marcus v. Collins, No. 16-cv-4221(GBD)(BCM), 2016 U.S. Dist. LEXIS 183519, 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016).

[44] Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995).

[45] Sajdlowska v. Guardian Serv. Indus. Inc., 16-cv-3947(PAE), 2016 U.S. Dist. LEXIS 166015, 2016 WL 7015755, at *4 (S.D.N.Y. Dec. 1, 2016) (citing **Harrington v. Atl. Sounding Co., Inc., 602 F.3d 113, 124 (2d Cir. 2010)**).

[46] DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 317 (2d Cir. 2021) (quoting Metro. Life Ins. Co. v. Bucsek, 919 F.3d 184, 191 (2d Cir. 2019)).

[47] See All. Bernstein Inv. Rsch. & Mgmt.; Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006) (quoting AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)).

[48] See Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 526, 202 L. Ed. 2d 480 (2019).

[49] Gingras v. Think Fin., Inc., 922 F.3d 112, 126 (2d Cir. 2019) (quoting Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 71, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2019)).

[50] Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir.

[51] Id.

[52] Hatemi v. M & T Bank, 633 F. App'x 47, 49 (2d Cir. 2016) (summary order) (quoting Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995)).

[53] Louis Dreyfus Negoce S.A., 252 F.3d at 224 (internal quotation marks omitted).

[54] Id.

be **[*15]** ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it."[55] "When parties use expansive language in drafting an arbitration clause," the Circuit has explained, "presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated."[56]

*Uber and Postmates Satisfied Their Initial Burden as to All Platform Plaintiffs Except Bensimon*

The Platform Plaintiffs claim that Uber has failed in its initial burden of "demonstrating that an agreement to arbitrate was made" as to plaintiff Bensimon.[57] Moreover, they claim that defendants Postmates and Grubhub have failed to establish that any plaintiff assented to their terms of use. Plaintiffs are correct that Uber has not satisfied its initial burden as to plaintiff Bensimon and that Grubhub has failed as to all plaintiffs. However, Uber has satisfied its initial burden that all Platform Plaintiffs, with the exception of Bensimon, agreed to an arbitration clause covering certain claims against Postmates.

*A. All Platform Plaintiffs Except Bensimon Assented to Uber's December 2021 Arbitration Clause*

With respect to Uber's December 2021 terms of use, Uber **[*16]** has set forth evidence — and plaintiffs do not dispute — that plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby expressly manifested assent to these terms through clickwrap agreements.[58] Uber notified users of those updated terms through an in-app blocking pop-up screen that appeared when a user opened an Uber app following the December 2021 update.[59] The pop-up screen had a header that stated, "We've updated our terms." Below that, in bigger text, it stated, "We encourage you to read our updated Terms in full."[60] The pop-up screen provided a hyperlink to Uber's terms of use.[61] The words "Terms of Use" were displayed in bright blue text that contrasted with the other font colors, indicating they were hyperlinks. If a user clicked the hyperlink, the terms of use were displayed.[62] To proceed past the pop-up screen, users were required to check affirmatively a box labeled, "By checking the box, I have reviewed and agreed to the Terms of Use and acknowledge the Privacy Notice" and subsequently were required to click a button labeled "Confirm."[63] It is undisputed that plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby clicked "Confirm" on this

---

[55] *Id.* (internal quotation marks omitted).

[56] *Id. at 225* (internal quotation marks omitted).

[57] *See Hines, Inc., 380 F. App'x at 24*.

Plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby do not dispute that they manifested assent to Uber's December 2021 terms of use. *See* Dkt 87, at 28-29.

[58] *See* Dkt 77, at 9-10; Dkt 87, at 28-29.

It is undisputed that plaintiff Bensimon's most recent use of the Uber platform was on November 18, 2021 and the December 2021 terms of use do not apply to him.

[59] Sullivan Decl. ¶ 39; see *id.* Ex. G.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

pop-up screen, thereby manifesting assent **[*17]** to Uber's terms of use, which contained an arbitration clause, delegation clause, and class action waiver.[64]

The arbitration clause in Uber's December 2021 terms of use covers certain disputes with Postmates also. Those terms require "Uber" users "to resolve any claim that [they] may have against Uber on an individual basis in arbitration as set forth in the Arbitration Agreement."[65] The December 2021 terms of use expressly define "Uber" to include "its subsidiaries."[66] Postmates has been a wholly owned subsidiary of Uber since December 1, 2020. Accordingly, Postmates has satisfied its initial burden of "demonstrating that an agreement to arbitrate was made" between Postmates and plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby.[67]

In the alternative, Uber argues that all of the Platform Plaintiffs, including plaintiff Bensimon, agreed to arbitrate disputes with Uber or Postmates pursuant to prior versions of Uber's terms of use or Postmates' pre-acquisition terms of use.[68] With respect to all of these alleged arbitration agreements, Uber has not satisfied its burden of demonstrating "by a showing of evidentiary facts" that an agreement to arbitrate was made **[*18]** between Uber or Postmates and the Platform Plaintiffs.[69]

Questions concerning whether the Platform Plaintiffs entered into valid arbitration agreements under the various contracts at issue are governed by either New York or California law depending on the particular contract and plaintiff at issue. For example, Uber's July 2021 terms of use, which were in effect when Bensimon last used his Uber account, specified that they would be "governed by and construed in accordance with the laws of the State of California.'"[70] Uber's December 2021 terms of use, on the other hand, include a general choice of law provision stating that the terms shall be construed in accordance with "the laws of the state in which your dispute arises."[71] In either event, the Second Circuit has found that New York and California apply "substantially similar rules for determining whether the parties have mutually assented to a contract term."[72]

Except with respect to its December 2021 terms of use, Uber has not established that any plaintiff expressly manifested assent to any arbitration agreement with Uber or Postmates.[73] Moreover, Uber has failed to establish that the Platform Plaintiffs were on "reasonable notice" **[*19]** of any such arbitration agreement.[74] Uber has not

---

[64] See Hines, 380 F. App'x at 25 ("[I]n the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that they have at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance.").

[65] Dkt 77, at 10.

[66] Sullivan Decl. Ex. F, at 55.

The December 2021 agreement "expressly supersede[d] prior agreements or arrangements regarding the use of Services" by users of Uber and its subsidiaries, including both Uber Eats and Postmates users. See Sullivan Decl. ¶¶ 19, 23, 36; id. Ex. F, at 36, 55.

[67] See Hines, 380 F. App'x at 24.

[68] See Dkt 90, at 7-8.

[69] Oppenheimer, 56 F.3d at 358.

[70] Sullivan Decl. ¶ 34.

[71] Id. ¶ 38.

[72] Meyer v. Uber Techs., Inc., 868 F.3d 66, 73-74 (2d Cir. 2017) (citation and internal quotation marks omitted) (applying California law).

[73] See Binder v. Aetna Life Ins. Co., 75 Cal. App. 4th 832, 850, 89 Cal. Rptr. 2d 540 (1999) (assent "may be manifested by written or spoken words, or by conduct").

submitted *any* evidence to demonstrate that Uber or Postmates' website or app would have put a reasonable person in the Platform Plaintiffs' position on notice of the existence of any of the alleged arbitration agreements. For example, Uber has failed to provide sufficient information about what its app or web page looked like when the Platform Plaintiffs initially signed up or at any other relevant time prior to December 2021. Without such information, it is impossible for the Court to conclude that the Platform Plaintiffs were on constructive notice of any arbitration agreement other than the December 2021 terms of use.[75] Thus, with the exception of the December 2021 terms, Uber has failed in its initial burden of "demonstrating that an agreement to arbitrate was made" between Uber or Postmates and the Platform Plaintiffs.[76]

*B. Grubhub Has Not Established that Any Agreement to Arbitrate Was Made*

Grubhub "bears [the] initial burden" of establishing that the Platform Plaintiffs made an agreement to arbitrate claims against the company.[77] Grubhub has failed to satisfy its burden as to any plaintiff.[78]

First, Grubhub claims [*20] that the Platform Plaintiffs manifested assent to arbitrate based upon a purported "clickwrap" agreement.[79] Yet, the Grubhub checkout page — where the Platform Plaintiffs allegedly manifested assent — does not require users to check a box or take any affirmative action indicating that they have assented to, let alone read, the Grubhub terms of use.[80] Rather, Grubhub alleges that the Platform Plaintiffs manifested assent by placing their orders on a page that states, in fine print, "[b]y placing your order you agree to Grubhub's terms of use."[81] The Second Circuit has held that this does not constitute a "clickwrap" agreement because "clicking 'Place your order' does not specifically manifest assent to the additional terms, for the purchaser is not specifically asked whether she agrees or to say 'I agree.'"[82] Accordingly, Grubhub's checkout page — as described in the Koreis Declaration — does not constitute a "clickwrap" agreement and Grubhub's case law regarding such agreements is inapposite.

---

[74] See Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1173-79 (9th Cir. 2014) (assent requires only "reasonable notice" of the terms of the agreement for electronic contracts).

[75] See Rui Chen v. Premier Fin. All., Inc., No. 18-cv-3771(YGR), 2019 U.S. Dist. LEXIS 10280, 2019 WL 280944, at *3 (N.D. Cal. Jan. 22, 2019) (denying motion to compel, where defendants did not offer "evidence explaining the design and content of the webpage or how the AMA appeared on the PFA website"); In re Stubhub Refund Litig., No. 20-md-02951(HSG), 2021 U.S. Dist. LEXIS 225104, 2021 WL 5447006, at *7-8 (N.D. Cal. Nov. 22, 2021) ("Because the Court does not know what the sign-up screen these eight Plaintiffs saw when they registered, the Court cannot adequately assess whether they received constructive notice of the User Agreement when they signed up with Stubhub."); Maree v. Deutsche Lufthansa AG, No. 20-cv-885(MWF), 2020 U.S. Dist. LEXIS 190145, 2020 WL 6018806, at *3 (C.D. Cal. Oct. 7, 2020) ("The Court agrees with Plaintiff that it would be improper to rule *on* the existence of an arbitration agreement without first determining, as a factual matter, what the website looked like on the relevant date.").

[76] See Hines, 380 F. App'x at 24.

[77] *Id.*

[78] Grubhub's terms of use provide that the terms are governed by New York law. *See* Koreis Decl. Ex. D.

[79] Dkt 73, at 8-10.

[80] *See* Koreis Decl. ¶ 10; *id.* Exs. B, C.

[81] *Id.*

[82] Nicosia, 834 F.3d at 236.

Second, Grubhub fails to provide sufficient evidence that Grubhub's terms of use "were presented" to the Platform Plaintiffs "in a way that would put" them "on inquiry notice of such terms."[83] Grubhub **[*21]** submits "[s]creenshots depicting the Grubhub checkout page" for both its mobile application and website,[84] but it does not specify which method the Platform Plaintiffs used to place orders.[85] Most significantly, Grubhub has not provided sufficient evidence concerning what its app or web page looked like at the time the Platform Plaintiffs placed their orders. Without that information, the Court cannot conclude that the Platform Plaintiffs were on constructive notice of the arbitration clause contained in Grubhub's terms of use.[86]

Finally, Grubhub claims that it "emailed customers, including each plaintiff, to inform them of the updated Terms of Use."[87] Grubhub submits a "true and correct copy of the email sent to customers to inform them of the [December 2021] updated terms."[88] This email states that Grubhub had "made changes to . . . [its] dispute resolution and arbitration agreement, which explains how legal disputes are handled," and notifies users, in bold and underlined text, that "continued use of Grubhub will confirm that you have reviewed and agreed to the updated Terms of Use . . . ."[89] However, Grubhub has not submitted any evidence to demonstrate when this email **[*22]** was sent and whether it was successfully delivered to or opened by any plaintiff.[90] Furthermore, in contrast to the cases it cited, Grubhub has not established that the Platform Plaintiffs assented to any prior iteration of Grubhub's terms of use. Accordingly, it has failed to demonstrate a course of dealing by which Platform Plaintiffs could be and have been on reasonable notice that updates to Grubhub's terms of use would be communicated by email notices to the email address affiliated with each plaintiff's Grubhub account.[91] In deciding defendants' motions to compel, the Court

---

[83] *Starke v. Square Trade, Inc., 913 F.3d 279, 289 (2d Cir. 2019)*.

[84] *See* Koreis Decl. ¶ 10; *id.* Exs. B, C.

[85] To the extent that plaintiffs placed their orders on Grubhub's website, rather than its mobile application, Grubhub has failed to meet its initial burden also because — much like the Amazon checkout page at issue in *Nicosia* - the link to Grubhub's terms of use "is not bold, capitalized, or conspicuous in light of the whole webpage." *834 F.3d at 237*. Moreover, there are "numerous other links on the webpage," in addition to "multiple buttons" and "sufficiently distracting" customer-and order-specific information. *Id.* Under like circumstances, the Second Circuit denied a motion to compel arbitration on the ground that Amazon "failed to show that [the plaintiff] was on notice and agreed to mandatory arbitration as a matter of law." *Id. at 238* (applying Washington law); *compare id. at 241* (Amazon checkout), *with* Koreis Decl. Ex. C (Grubhub checkout web page).

[86] *See Bazemore v. Jefferson Capital Sys., LLC, 827 F.3d 1325, 1330-31 (11th Cir. 2016)* (denying motion to compel where there was "no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"); *Snow v. Eventbrite, Inc., 20-cv-03698(WHO), 2020 U.S. Dist. LEXIS 193249, 2020 WL 6135990, at *4-6 (N.D. Cal. Oct. 19, 2020)* ("Eventbrite would only be able to carry its burden if it could show what the agreements looked like during the period when the plaintiffs would have actually seen them.").

[87] Koreis Decl. ¶ 12.

[88] *Id.; id.* Ex. G.

[89] *Id.*

[90] *See Sacchi v. Verizon Online LLC, No. 14-cv-423(RA), 2015 U.S. Dist. LEXIS 21349, 2015 WL 765940, at *3 (S.D.N.Y. Feb. 23, 2015)* (agreement to arbitrate found where defendant submitted evidence that its email notices were successfully delivered to and opened by plaintiff).

[91] *See Wilson v. Redbox Automated Retail, LLC, 448 F. Supp. 3d 873, 886 n.3 (N.D. Ill. 2020)* (distinguishing *Pincaro v. Glassdoor, Inc., No. 16-cv-6870(ER), 2017 U.S. Dist. LEXIS 147517, 2017 WL 4046317 (S.D.N.Y. Sept. 12, 2017)*, cited by Grubhub, and denying motion to compel on a similar basis); *Sarchi v. Uber Techs., Inc., 2022 ME 8, 268 A.3d 258, 273 n.15 (Maine 2022)* (same).

must draw all reasonable inferences in favor of the non-moving party.[92] In all the circumstances, Grubhub has failed to demonstrate that an agreement to arbitrate was made between the company and any plaintiff.

*Threshold Issue of Arbitrability*

*A. The Enforceability of Uber's Arbitration Clause Is an Issue for the Court*

Given that Uber and Postmates have satisfied their initial burden as to plaintiffs Boisi, Davitashvili, Eliades, Obey, and Swaby, the Court must determine whether the threshold issue of arbitrability has been delegated exclusively to the arbitrator.

> Section 2(a)(4) of Uber's December 2021 terms of [*23] use provides in relevant part: *"Only an arbitrator*, and not any federal, state, or local court or agency, *shall have exclusive authority to resolve any dispute* arising out of or relating to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement, including without limitation any claim that all or any part of this Arbitration Agreement is void or voidable. *An arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues*, including issues relating to whether the Terms are applicable, unconscionable, or illusory and any defense to arbitration, including without limitation waiver, delay, laches, or estoppel."[93]

This language clearly and unmistakably provides that "all threshold arbitrability issues," including issues of contract formation or unconscionability, will be decided by an arbitrator.[94] However, as in *Gingras v. Think Finance, Inc.*, plaintiffs "mount a convincing challenge to the arbitration clause itself," and their opposition to Uber's motion asserts that "[t]he delegation provision of the [December 2021 terms of use] is also [unconscionable]."[95] "That specific attack on the delegation provision is sufficient to make [*24] the issue of arbitrability one for a federal court" and thus the Court is "correct to decide it."[96]

*B. Grubhub's Terms of Use Expressly Delegate Arbitrability Issues to the Court*

Even if Grubhub had established that the Platform Plaintiffs had assented to its terms of use, the issue of arbitrability would remain with the Court. The Second Circuit instructs that "the issue of whether the parties agreed to arbitrate a matter is to be decided by the courts and not the arbitrators, [u]nless the parties clearly and unmistakably provide otherwise."[97] Grubhub's arbitration clause states that "issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide."[98] Accordingly, the arbitrability of plaintiffs' claims against Grubhub would be decided by the Court.

*Defendants' Infinite Arbitration Clauses Do Not Apply to Plaintiffs' Claims*

---

[92] *Nicosia, 834 F.3d at 229* (quoting *Bensadoun, 316 F.3d at 175*).

[93] Sullivan Decl. Ex. F, at 59-60 (emphasis added).

[94] *Id.*

[95] See Dkt 87, at 34 & n.9; *Gingras, 922 F.3d at 126*.

[96] *Gingras, 922 F.3d at 126*.

[97] *Schaffran, 445 F.3d at 125* (quoting *AT & T Techs., 475 U.S. at 649*).

[98] Koreis Decl. Ex. D, at 21.

Defendants' arbitration clauses are examples of a "'relatively new and untested' species of arbitration clause,"[99] which one scholar aptly has described as an "infinite arbitration clause."[100] If enforced according to their terms, they would require arbitration of *any* claims between defendants and the Platform Plaintiffs, [*25] including claims without any nexus to the agreements containing the clauses — i.e., defendants' terms of use. In *Smith v. Steinkamp*, Judge Posner colorfully illustrated the "absurd results" that would ensue if a payday lender's similarly broad arbitration clause were "read as standing free from any loan agreement."[101] For example, Judge Posner mused:

> "if Instant Cash murdered [plaintiff] in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash . . . , Instant Cash could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked [plaintiff s] pocket when she came in to pay back the loan, and [plaintiff] sued the employee for conversion, he would be entitled to arbitration of her claim. It would make no difference [if] the conversion had occurred in [plaintiff's] home 20 years after her last transaction with Instant Cash."[102]

Since *Smith*, the Ninth Circuit and several district courts have declined to enforce "infinite arbitration clauses" where, as here, the claims at issue lacked any nexus to the agreement containing the clause.[103] In this district, Judge Furman held as a matter of New [*26] York law that an arbitration clause substantially similar to those in defendants' terms of use could not be applied to claims without a nexus to the underlying agreement as a matter of contract formation and unconscionability.[104] This Court concurs.

Plaintiffs' claims are completely unrelated to their use of defendants' platforms. To the contrary, their claims specifically exclude any purchases made through defendants' platforms and are based solely on purchases made directly from restaurants or from non-defendant meal-delivery platforms. The fact that the Platform Plaintiffs at some time used some of the defendants' platforms is purely coincidental, as demonstrated by plaintiff Drewey who has well-plead claims despite never having used any of the defendants' platforms.[105]

As a matter of contract formation, "New York law provides that 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."[106] "[W]here some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part," courts "may as a matter of interpretation carry out the intention of [the] [*27] contract by transposing,

---

[99] *McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021)* (quoting *Mey v. DIRECTV, LLC, 971 F.3d 284, 302 (4th Cir. 2020)* (Harris, J., dissenting)).

[100] See David Horton, Arbitration Clauses, 168 U. Pa. L. Rev. 633, 639-40

[101] *318 F.3d 775, 776-77 (7th Cir. 2003)*.

[102] *Id.* at 777.

[103] See *Revitch v. DIRECTV, LLC, 977 F.3d 713, 717-21 (9th Cir. 2020)*; *McFarlane, 524 F. Supp. 3d at 275*; *Hearn v. Comcast Cable Commc'ns, LLC, 415 F. Supp. 3d 1155, 1161 (N.D. Ga. 2019)*; *Wexler v. AT & T Corp., 211 F. Supp. 3d 500, 503-05 (E.D.N.Y. 2016)*; *In re Jiffy Lube Int'l, Inc., Text Spam Litig., 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012)*.

[104] *McFarlane, 524 F. Supp. 3d at 279* ("[W]hether as a matter of contract formation or unconscionability, the Court holds that the Arbitration Provision does not apply to Plaintiffs' claims to the extent that they lack any nexus to the cable service agreement.").

[105] See Dkt 46, at 37 (denying defendants' joint motion to dismiss in its entirety).

[106] *McFarlane, 524 F. Supp. 3d at 277* (quoting *Greenwich Capital Fin. Prods., Inc. v. Negrin, 74 A.D.3d 413, 903 N.Y.S.2d 346, 348 (App. Div. 1st Dep't 2010)* (internal quotation marks omitted)).

rejecting, or supplying words to make the meaning of the contract more clear."[107] Applying these principles here, the Court reaches the same conclusion that the *McFarlane, Revitch*, and *Wexler* Courts reached:

> "'Notwithstanding the literal meaning of the clause's language, no reasonable person would think that' agreeing to [defendants' terms of use] would obligate [him or her] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of [its] affiliates. . . . Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the [terms of use] agreement with [defendants]."[108]

In the alternative, it would be unconscionable to enforce defendants' arbitration clauses with respect to claims untethered to defendants' respective terms of use. Under New York law, "[a]n unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."[109] Defendants' arbitration clauses fall within this definition. If interpreted literally, [*28] they would produce grossly unreasonable outcomes that would contravene a reasonable person's expectations. For example, according to their literal terms, defendants' arbitration clauses would require a user of defendants' platforms to arbitrate claims for securities fraud, personal injury, or wrongful termination that have nothing to do with the plaintiff's use of the platform. Accordingly, "as a matter of general unconscionability doctrine, [defendants' arbitration clauses] must be construed to apply only to claims that have some nexus to the contract of which it is part.[110]

In sum, as a matter of either contract formation or unconscionability, the Court holds that defendants' arbitration clauses do not apply to plaintiffs' claims to the extent they lack any nexus to the underlying contracts — i.e., to the extent they are not brought by plaintiffs in their capacities as a current or former users of defendants' platforms.[111]

*Defendants' Infinite Class Action Waivers Do Not Apply to Plaintiffs' Claims*

Defendants' attempts to enforce their expansive class action waivers fail for the same reasons as do their infinite arbitration clauses. Defendants' class action waivers purport to waive [*29] the Platform Plaintiffs' right to seek class-wide relief with respect to *any* dispute between the parties, no matter how untethered it is to the defendants' terms of use. As set forth above, whether as a matter of contract formation or unconscionability, defendants cannot enforce such infinitely broad class action waivers against plaintiffs' claims to the extent they lack any nexus with the terms of use.[112] Accordingly, the class action waivers contained in defendants' terms of use do not apply to plaintiffs' claims.

---

[107] *Jade Realty LLC v. Citigroup Commercial Mortg. Tr. 2005-EMG, 20 N.Y.3d 881, 980 N.E.2d 945, 957 N.Y.S.2d 280, 282 (2012)* (internal quotation marks omitted).

[108] *McFarlane, 524 F. Supp. 3d at 277* (quoting *Wexler, 211 F. Supp. 3d at 504*).

[109] *Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 534 N.E.2d 824, 537 N.Y.S.2d 787, 791 (1988)* (internal quotation marks omitted).

[110] *McFarlane, 524 F. Supp. 3d at 278*.

[111] *See id.* at 279.

[112] *See Haymount Urgent Care PC v. GoFund Advance, LLC, No. 22-cv-1245 (JSR), 2022 U.S. Dist. LEXIS 186768, 2022 WL 6994507, at *6 n.5 (S.D.N.Y. Oct. 12, 2022)* (citing *McFarlane, 524 F. Supp. 3d at 276-77*) ("To the extent defendants sought to enforce the [class action] waiver against claims not arising directly out of the MCA agreements -- as might be the case if plaintiffs' *Section 1983* claims were still in the case -- there would be a much stronger argument that enforcement of the class action waiver would be unconscionable.").

*Conclusion*

For the foregoing reasons, defendants' motions to compel arbitration (Dkt 72; Dkt 76) are denied in their entirety. Uber's motion to stay this action pursuant to 9 U.S.C. § 3 is denied as moot.

SO ORDERED.

Dated: March 16, 2023

/s/ Lewis A. Kaplan

Lewis A. Kaplan

United States District Judge

---

End of Document